**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| **DIANA WILSON**,<br>210 Cedar Drive<br>Glen Burnie, Maryland 21060,<br><br>*individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>**ANNE ARUNDEL DERMATOLOGY, P.A,** 1306 Concourse Drive, Suite 201, Linthicum Heights, Anne Arundel County, Maryland 21090,<br><br>Defendant. | Case No. 1:25-cv-02324<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Diana Wilson, individually and on behalf of all others similarly situated, for her Class Action Complaint, bring this action against Anne Arundel Dermatology, P.A. ("AAD") based on personal knowledge and the investigation of counsel and alleges as follows:

## I. INTRODUCTION

1. Between February 14, 2025 and May 13, 2025, an unknown actor gained access to Defendant's inadequately protected computer systems. As a result, hundreds, if not thousands, of individuals, including Plaintiff and the Class Members (as further defined below), have had their personal identifiable information ("PII")[1] and private health information ("PHI") (collectively, with PII, "Private Information") exposed (the "Data Breach").

[1] Personal identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

## II. THE PARTIES

2. Plaintiff Wilson is a citizen and resident of Maryland.

3. AAD is headquartered in Linthicum Heights, Maryland.

4. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

5. All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## III. JURISDICTION AND VENUE

6. This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs; there are more than 100 members in the proposed class; and at least one Class Member, including Plaintiff is a citizen of a state different from Defendant to establish minimal diversity.

7. Defendant is a citizen of Maryland because its principal place of business is in Maryland.

8. This Court has personal jurisdiction over Defendant because it conducts substantial business in Maryland and this District and collected and/or stored the PII of Plaintiff and Class Members in this District.

9. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant operates in this District and a substantial part of the events or omissions giving rise to Plaintiff and

the Class Members' claims occurred in this District, including Defendant collecting and/or storing the PII of Plaintiff and Class Members.

## IV. FACTUAL ALLEGATIONS

### *A. BACKGROUND*

10. Defendant provides medical services, including dermatology services, in multiple states along the east coast..

11. In order to provide medical services, Defendant requires Plaintiff's and Class Members' PII/PHI, including their names, dates of birth, email addresses, physical addresses, Social Security numbers, financial account information, health insurance information, and medical history.

12. Defendant collected, stored, and maintained the PII/PHI of Plaintiff and the Class Members on its network. Defendant, however, failed to take reasonable and necessary steps to ensure that its network was secure.

13. By obtaining, collecting, and storing the PII/PHI of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII/PHI from disclosure.

14. Plaintiff and other Members of the Class entrusted their PII/PHI to Defendant.

15. Plaintiff and Class Members relied on this sophisticated Defendant to keep their PII/PHI confidential and securely maintained, to use for information for business purposes only, and to only make authorized disclosures of this information. Plaintiff and Class Members demanded security to safeguard their PII/PHI.

16. Defendant had a duty to adopt reasonable measures to protect the PII/PHI of Plaintiff and the Class Members from involuntary disclosure to third parties.

17. Despite recognizing its duty to do so, on information and belief, Defendant has not implemented reasonable cybersecurity safeguards or policies to protect its consumers' PII/PHI or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. Rather, Defendant chose to store Plaintiff's and the Class Members' PII/PHI on an unsecure network, leaving their PII/PHI vulnerable for cybercriminals to take. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to patients' PII/PHI.

### *B. The Data Breach*

18. Between February 14, 2025 and May 13, 2025, due to Defendant's failure to maintain an adequate security system, an unknown hacker gained access to Defendant's systems and acquired certain files and information, including Plaintiff and Class Members' PII/PHI.

19. Defendant detected the Data Breach as early as February 14, 2024; however, it failed to stop the spread of the Data Breach until the next day. During that time, an unknown cybercriminal was able to access files and folders containing Plaintiff's and the Class Members' PII/PHI.

20. The targeted cyberattack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the PII/PHI of patients like Plaintiff and Class Members.

21. Defendant took time to conclude its investigation of the Data Breach. On May 20, 2024, AAD posted its website notice and filed notice of the data breach with the U.S. Department of Health and Human Services Office for Civil Rights.

22. Defendant admitted that an unauthorized actor accessed sensitive information about Plaintiff and Class Members.

23. The details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur have not been shared with regulators or Plaintiff and Class Members, who retain a vested interest in ensuring that their information remains protected.

24. The unencrypted PII/PHI of Plaintiff and Class Members may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII/PHI for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII/PHI of Plaintiff and Class Members.

25. Defendant was negligent and did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiff and Class Members, causing the exposure of PII/PHI for Plaintiff and Class Members.

26. Because Defendant had a duty to protect Plaintiff's and Class Members' PII/PHI, Defendant should have known through readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

27. Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect patients' and customers' PII/PHI;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that its vendors with access to its computer systems and data

employed reasonable security procedures;

e. Failing to train its employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

f. Failing to ensure the confidentiality and integrity of electronic PII/PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

g. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PII/PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

h. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

i. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

j. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PII/PHI in violation of 45 C.F.R. § 164.306(a)(2);

k. Failing to protect against reasonably anticipated uses or disclosures of electronic PII/PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

l. Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

m. Failing to train all members of its workforces effectively on the policies and procedures regarding PII/PHI as necessary and appropriate for the members of its

workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

n. Failing to render the electronic PII/PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PII/PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

o. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

p. Failing to adhere to industry standards for cybersecurity as discussed above; and

q. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

28. Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII/PHI by allowing cyberthieves to access Defendant's computer network and systems which contained unsecured and unencrypted PII/PHI.

29. Accordingly, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with Defendant.

### *C. The Data Breach was Foreseeable*

30. In the months immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks because warnings were readily available and accessible via the internet.

31. In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[2]

32. Medical facilities, such as Defendant, collect and store large amounts of critical, highly valuable corporate records.

33. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that: (i) cybercriminals were targeting big companies such as Defendant, (ii) cybercriminals were ferociously aggressive in their pursuit of companies in possession of significant sensitive information such as Defendant, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

34. Considering the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted PII/PHI of Plaintiff and Class Members in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII/PHI, and Defendant's type of business had cause to be particularly on guard against such an attack.

35. Prior to the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII/PHI could be accessed, exfiltrated, and published as the result of a cyberattack.

---

[2] FBI, High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations (Oct. 2, 2019) (emphasis added), *available at* https://www.ic3.gov/Media/Y2019/PSA191002 (last visited Jan. 25, 2022).

36. Prior to the Data Breach, Defendant knew or should have known that it should have encrypted the Social Security numbers and other sensitive data elements within the PII/PHI to protect against their publication and misuse in the event of a cyberattack.

### *D. THE DATA BREACH WAS PREVENTABLE*

37. By obtaining, collecting, and storing the PII/PHI of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII/PHI from disclosure.

38. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[3]

39. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

a. Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

b. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

c. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d. Configure firewalls to block access to known malicious IP addresses.

e. Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

f. Set anti-virus and anti-malware programs to conduct regular scans automatically.

---

[3] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited July 17, 2023).

g. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h. Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

j. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/ decompression programs, including the "AppData/LocalAppData" folder.

k. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

l. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

m. Execute operating system environments or specific programs in a virtualized environment.

n. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[4]

40. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

(1) **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks. . . .

(2) **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself.

[4] *Id.* at 3-4.

> Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net). . . .
>
> (3) **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.
>
> (4) **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it. . . .
>
> (5) **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.
>
> (6) **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.
>
> (7) **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic. . . .[5]

41. Given that Defendant was storing the PII/PHI of other individuals, Defendant could and should have implemented all the above measures to prevent and detect ransomware attacks.

42. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the PII/PHI of Plaintiff and Class Members.

43. Defendants could have prevented this Data Breach by properly securing and encrypting the folders, files, and or data fields containing the PII/PHI of Plaintiff and Class Members. Alternatively, Defendant could have destroyed the data it no longer had a reasonable

---

[5] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://www.cisa.gov/news-events/news/protecting-against-ransomware (last visited July 17, 2023).

need to maintain or only stored data in an Internet-accessible environment when there was a reasonable need to do so.

44. Defendant's negligence in safeguarding the PII/PHI of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

***E. VALUE OF PII/PHI***

45. The PII/PHI of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[6] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[7] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[8]

46. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

[6] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed July 17, 2023).

[7] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed July17, 2023).

[8] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed July 17, 2023).

47. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[9]

48. One such example of criminals using PII/PHI for profit is the development of "Fullz" packages.

49. Cyber-criminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

50. The development of "*Fullz*" packages means that stolen PII/PHI from the Data Breach can easily be used to link and identify it to Plaintiff's and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a *Fullz* package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

51. That is exactly what is happening to Plaintiff and members of the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and the Class's stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

---

[9] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed July 17, 2023).

52. Medical information is especially valuable to identity thieves.

53. Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[10]

54. Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

55. Healthcare data record may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[11]

### *F. Plaintiff's Experience*

56. Plaintiff was a patient at one of AAD's location.

57. In order to receive services from AAD, Plaintiff provided AAD with her PII/PHI, including his name, date of birth, Social Security number, email address, physical address, phone number, financial account information, and medical insurance information. AAD accepted and stored this PII/PHI in the regular course of business. AAD then created and stored additional PHI, including medical records for Plaintiff.

---

[10] *See* Federal Trade Commission, *Medical Identity Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited March 18, 2024).

[11] Impravata, *Hackers, breaches, and the value of healthcare data,* (Jun. 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers#:~:text=Often%20these%20attacks%20see%20hundreds,record%20(a%20payment%20card) (last visited March 18, 2024).

58. As a result of the Data Breach, Plaintiff's sensitive information has been accessed and/or acquired by an unauthorized actor. The confidentiality of Plaintiff's sensitive information has been irreparably harmed. For the rest of her life, Plaintiff will have to worry about when and how her sensitive information may be shared or used to her detriment.

59. As a result of the Data Breach, Plaintiff spent hours dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring her accounts, reviewing credit reports, and mitigating fraud and identity theft. This time has been lost forever and cannot be recaptured.

60. Additionally, Plaintiff is very careful about not sharing her sensitive PII/PHI. He has never knowingly transmitted unencrypted sensitive PII/PHI over the internet or any other unsecured source.

61. Plaintiff stores any documents containing her sensitive PII/PHI in safe and secure locations or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for his various online accounts.

62. Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and experiences fear and anxiety and increased concern for the loss of her privacy.

63. Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of unauthorized third parties and possibly criminals.

64. Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *G. Plaintiff' and the Class Members' Injuries*

65. Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

66. Defendant negligently disclosed the PII/PHI of Plaintiff and the Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII/PHI of Plaintiff and the Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII/PHI.

67. Defendant was, or should have been, fully aware of the unique type and the significant volume of data contained in Defendant's database, amounting to potentially thousands of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

68. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII/PHI of Plaintiff and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

69. The injuries to Plaintiff and Class Members are directly and proximately caused by Defendant's negligence and failure to implement or maintain adequate data security measures for the PII/PHI of Plaintiff and Class Members.

#### ***Plaintiff's and the Class Members' PII is Available on the Dark Web***

70. Upon information and belief, the unauthorized third-party cybercriminals gained access to Plaintiff's and Class Members' PII/PHI with the intent of engaging in misuse of the PII/PHI, including marketing and selling Plaintiff's and Class Members' PII/PHI.

71. Upon information and believe, the unencrypted Private Information of Plaintiff and Class Members is for sale on the dark web because that is the *modus operandi* of hackers.

***Plaintiff and the Class Members Have Experienced Misuse***

72. As a result of the Data Breach, the unencrypted and detailed PII/PHI of Plaintiff and the Class Members has fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members, as seen by the increase in spam calls and emails. Unauthorized actors can easily access and misuse Plaintiff's and Class Members' PII/PHI due to the Data Breach. Plaintiff has already experienced misuse of his PII/PHI as a result of the Data Breach.

73. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII/PHI to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed herein.

74. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

75. For example, armed with just a name and Social Security number, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or financial account information.

Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

76. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[12]

77. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

78. Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that

[12] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

old bad information is quickly inherited into the new Social Security number."[13]

***Plaintiff's and the Class Members' Lost Time***

79. Plaintiff and the Class Members have also spent considerable time and will continue to spend considerable time to protect themselves and keep their identities and personal property protected.

80. Time is a compensable and valuable resource in the United States. According to the U.S. Bureau of Labor Statistics, 55.5% of U.S.-based workers are compensated on an hourly basis, while the other 44.5% are salaried.[14]

81. According to the U.S. Bureau of Labor Statistics' 2018 American Time Use Survey, American adults have only 36 to 40 hours of "leisure time" outside of work per week; leisure time is defined as time not occupied with work or chores and is "the time equivalent of 'disposable income.'"[15] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

[13] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Aug. 23, 2024).

[14] *Characteristics of minimum wage workers, 2020*, U.S. BUREAU OF LABOR STATISTICS https://www.bls.gov/opub/reports/minimum-wage/2020/home.htm#:~:text=%20In%202020%2C%2073.3%20million%20workers,wage%20of%20%247.25%20 per%20hour (last accessed March 18, 2024); *Average Weekly Wage Data*, U.S. BUREAU OF LABOR STATISTICS, *Average Weekly Wage Data*, https://www.bls.gov/news.release/pdf/wkyeng.pdf (last accessed May 9 2024) (finding that on average, private-sector workers make $1,145 per 40-hour work week.).

[15] Cory Stieg, *You're spending your free time wrong — here's what to do to be happier and more successful*, CNBC https://www.cnbc.com/2019/11/06/how-successful-people-spend-leisure-time-james-wallman.html (Nov. 6, 2019) (last accessed May 9, 2024).

82. Plaintiff and Class Members are now deprived of the choice as to how to spend their valuable free hours and seek renumeration for the loss of valuable time as another element of damages.

***Plaintiff's and the Class Members Heightened Risk of Identity Theft and Ongoing Injuries***

83. Cyberattacks and data breaches at healthcare companies and partner companies like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

84. Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[16]

85. Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[17]

86. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[18]

87. That is because any victim of a data breach is exposed to serious ramifications

[16] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks (last visited March 18, 2024).

[17] *See* Sung J. Choi et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Research 971, 971-980 (2019), available at https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.

[18] *See* U.S. Gov't Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (2007), available at https://www.gao.gov/new.items/d07737.pdf (last visited March 18, 2024).

regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

88. Moreover, theft of PII/PHI is also gravely serious because PII/PHI is an extremely valuable property right.[19]

89. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII/PHI has considerable market value.

90. Additional fraudulent activity resulting from the Data Breach may not come to light for years.

[19] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

91. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII/PHI is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[20]

92. As a result of the Data Breach, Cybercriminals also have sufficient information to pose as legitimate persons and gain more information from Plaintiff and the Class Members, putting Plaintiff and the Class Members at a continuing risk of identity theft.

93. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

94. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

## V. CLASS ACTION ALLEGATIONS

95. Plaintiff brings this nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23.

---

[20] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last accessed July 17, 2023).

96. The Class that Plaintiff seeks to represent is denied as follows:

> All individuals whose PII/PHI may have been accessed and/or acquired in the cyberattack that is the subject of the Notice of Data Breach that Defendant sent to Plaintiff and Class Members in July 2025 (the "Class").

97. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

98. Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

99. **Numerosity:** The Class is so numerous that joinder of all members is impracticable. Defendant services over a hundred thousand patients each year. The Class contains at least hundreds, if not thousands of people.

100. **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the PII/PHI of Plaintiff and Class Members;

b. Whether Defendant had duties not to disclose the PII/PHI of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant had duties not to use the PII/PHI of Plaintiff and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the PII/PHI of Plaintiff and Class Members;

e. When Defendant actually learned of the Data Breach;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII/PHI had been compromised;

g. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII/PHI had been compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Defendant engaged in unfair, unlawful, or deceptive practice by failing to safeguard the PII/PHI of Plaintiff and Class Members;

k. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

l. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

m. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

101. **Typicality:** Plaintiff's claims are typical of those of other Class Members because all had their PII/PHI compromised as a result of the Data Breach, due to Defendant's misfeasance.

102. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to, and affect, Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

103. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

104. **Superiority and Manageability:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

105. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

106. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

107. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

108. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII/PHI of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

109. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to Class Members as a whole is appropriate.

110. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII/PHI;

b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII/PHI;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their PII/PHI had been compromised;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiff and Class Members; and

g. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## VI. CAUSES OF ACTION

### COUNT I – NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

111. Plaintiff incorporates by reference paragraphs the forgoing paragraphs as though fully set forth herein.

112. Defendant solicited, gathered, and stored Plaintiff's and the Class's PII/PHI as part of the operation of its business.

113. Upon accepting and storing the PII of Plaintiff and Class Members, Defendant undertook and owed a duty to Plaintiff and Class Members to exercise reasonable care to secure and safeguard that information and to use secure methods to do so.

114. Defendant had full knowledge of the sensitivity of the PII/PHI, the types of harm that Plaintiff and Class members could and would suffer if the PII/PHI was wrongfully disclosed, and the importance of adequate security.

115. Plaintiff and Class members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class members had no ability to protect their PII that was in Defendant's possession. As such, a special relationship existed between Defendant and Plaintiff and the Class.

116. Defendant was well aware of the fact that cyber criminals routinely target large corporations through cyberattacks in an attempt to steal sensitive PII/PHI.

117. Defendant owed Plaintiff and the Class members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard such data.

118. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement

(Second) of Torts § 302B. Numerous courts and legislatures also have recognized the existence of a specific duty to reasonably safeguard personal information.

119. Defendant had duties to protect and safeguard the PII of Plaintiff and the Class from being vulnerable to cyberattacks by taking common-sense precautions when dealing with sensitive PII/PHI.

120. Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

121. As a proximate and foreseeable result of Defendant's negligent and/or grossly negligent conduct, Plaintiff and the Class have suffered damages and are at imminent risk of additional harms and damages.

122. Though Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the PII/PHI of Plaintiff and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the PII/PHI of Plaintiff and Class Members while it was within Defendant's possession and control.

123. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and the Nationwide Class. The Private Information of Plaintiff and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

124. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients, which is recognized by

laws and regulations including but not limited to HIPAA, the FTC Act, and common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

125. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

126. Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

127. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

128. Defendant's violation of Section 5 of the FTC Act constitutes negligence.

129. Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

130. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members

131. Defendant's duty to act reasonably in collecting, storing, and maintaining the Private Information, and to use reasonable care in protecting such information arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information that it either affirmatively acquires, maintains, or stores. Industry standards require Defendant to exercise reasonable care with respect to Plaintiff and Class Members by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and Class Members. Industry best practices put the onus of adequate cybersecurity on the entity most capable of preventing a Data Breach. In this case, Defendant was the only entity that could adequately protect the data that that it solicited, collected, and stored.

132. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on

credit reports; (vii) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of Plaintiff and Class Members; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

133. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

134. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

135. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## COUNT II
## BREACH OF IMPLIED CONTRACT
## (On behalf of Plaintiff and the Class)

136. Plaintiff incorporates by reference the forgoing paragraphs as though fully set forth herein.

137. Plaintiff and Class Members entered into implied contracts with Defendant under

which Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

138. Plaintiff and Class Members were required to deliver, and did deliver, their Private Information to Defendant as part of the process of obtaining medical services provided by Defendant. Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for services.

139. Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

140. Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

141. When Plaintiff and Class Members paid money and provided their Private Information to their healthcare providers, either directly or indirectly, in the exchange for goods and services, they entered into implied contracts with their healthcare providers and their business partners, including Defendant, and intended and understood that Private Information would be adequately safeguarded as part of that service.

142. Plaintiff and Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

143. In accepting such information and payment for services, Plaintiff and the other Class Members entered into an implied contract with Defendant whereby Defendant became obligated to reasonably safeguard Plaintiff's and the other Class Members' Private Information.

144. In delivering their Private Information to Defendant and paying for healthcare services, Plaintiff and Class Members intended and understood that Defendant would adequately safeguard the data as part of that service.

145. The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under HIPAA or other state of federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

146. The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized medical purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

147. Defendant's implied promises to safeguard Plaintiff's and Class Members' Private Information are evidenced by the information contained on its website.

148. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

149. Had Defendant disclosed to Plaintiff and Class Members that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and the other Class Members would not have provided their Sensitive Information to Defendant.

150. Defendant recognized that Plaintiff's and Class Members' Private Information is

highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

151. Plaintiff and the other Class Members fully performed their obligations under the implied contracts with Defendant.

152. Defendant breached the implied contract with Plaintiff and the other Class Members by failing to take reasonable measures to safeguard their Private Information as described herein.

153. As a direct and proximate result of Defendant's conduct, Plaintiff and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial, or alternatively, nominal damages.

**COUNT III – DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

154. Plaintiff incorporates by reference the forgoing paragraphs as though fully set forth herein.

155. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Further, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

156. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and the Class's PII/PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and the Class from further data breaches that compromise their PII/PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Defendant publicly denies these allegations. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her PII/PHI and remains at imminent risk that further compromises of their PII/PHI

will occur in the future. It is unknown what specific measures and changes Defendant has undertaken in response to the Data Breach.

157. Plaintiff and the Class have an ongoing, actionable dispute arising out of Defendant's inadequate security measures, including (i) Defendant's failure to encrypt Plaintiff's and the Class's PII/PHI, including Social Security numbers, while storing it in an Internet-accessible environment, and (ii) Defendant's failure to delete PII/PHI it has no reasonable need to maintain in an Internet-accessible environment, including the Social Security numbers of Plaintiff and the Class.

158. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure the PII/PHI of Plaintiff and the Class;

b. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII/PHI; and

c. Defendant's ongoing breaches of its legal duty continue to cause Plaintiff and the Class harm.

159. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry and government regulatory standards to protect consumers' PII/PHI. Specifically, this injunction should, among other things, direct Defendant to:

a. Engage third party auditors, consistent with industry standards, to test its systems for weakness and upgrade any such weakness found;

b. Audit, test, and train its data security personnel regarding any new or modified procedures and how to respond to a data breach;

c. Regularly test its systems for security vulnerabilities, consistent with industry standards; and

d. Implement an education and training program for appropriate employees regarding cybersecurity.

160. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

161. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

162. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and others whose confidential information would be further compromised.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendant as follows:

1. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff are a proper representative of the Class requested herein;

2. A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including actual and statutory damages, punitive damages, attorney fees, expenses, costs, and such other and further relief as is just and proper;
3. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class and the general public as requested herein, including, but not limited to:
   i. Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;
   ii. Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;
   iii. Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;
   iv. Ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;
   v. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for their provisions of services;
   vi. Ordering that Defendant conduct regular database scanning and securing checks; and

vii. Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

4. An order requiring Defendant to pay the costs involved in notifying the Class members about the judgment and administering the claims process;
5. A judgment in favor of Plaintiff and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and
6. An award of such other and further relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues to triable.

Dated: July 17, 2025

Respectfully submitted,

/s/ *Zachary E. Howerton*
Zachary E. Howerton (Fed. Bar No. 20688)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
223 Duke of Gloucester Street
Annapolis, MD 21401
Telephone: (410) 269-6620
Facsimile: (410) 269-1235
zhowerton@milberg.com

William B. Federman*
Jessica A. Wilkes*
**Federman & Sherwood**
10205 N. Pennsylvania Ave
Oklahoma City, OK 73120
Telephone: (405) 235-1560
E: wbf@federmanlaw.com
E: jaw@federmanlaw.com

**Pro Hac Vice Forthcoming*

*Attorneys for the Plaintiff and Proposed Lead for the Class*